UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
RICHARD HERSHEY,                                        :
                                                       :
                                    Plaintiff,         :          12 Civ. 3853 (PAE)
                                                       :
                  -v-                                  :          OPINION & ORDER
                                                       :
MATTHEW GOLDSTEIN, Chancellor and Chief                :
Executive Officer of the City University of New York;  :
RICARDO R. FERNANDEZ, President of Lehman               :
College; DOMENICK A. LAPERUTA, Lehman College          :
Director of Public Safety; VINCENT ZUCCHETTO,          :
Executive Assistant to the Vice President for Student  :
Affairs at Lehman College; ESDRAS TULIER, Special      :
Counsel to the President of Lehman College; CUNY Public:
Safety Officer EDWIN FREYTES, Shield No. 470; CUNY     :
Public Safety Officer IRIZARIZ, Shield No. 353; CUNY   :
Public Safety Sergeant GALLAN, Shield No. 209; CUNY    :
Public Safety Lieutenant CRUZ, Shield No. 120; JOHN    :
DOES; AND RICHARD ROES,                                :
                                                       :
                                    Defendants.        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Richard Hershey ("Hershey") brings this lawsuit under 42 U.S.C. § 1983 against

various officials and administrators of Lehman College ("Lehman"), the Chancellor and Chief

Executive Officer of the City University of New York ("CUNY"), and a collection of CUNY

Public Safety officers (collectively, "defendants"), alleging that defendants violated his rights

under the United States Constitution, including the First, Fourth, and Fourteenth Amendments, in

connection with restrictions imposed on his leafleting on the Lehman campus and in certain areas

outside of the campus gates.  Also as a result of these restrictions, and his subsequent arrest

outside of the campus gates, Hershey brings claims of assault and battery, malicious prosecution,

abuse of process, negligence, and violations of the New York State Constitution.  Defendants

move to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).
For the following reasons, that motion is granted in part and denied in part.

## I.     Background[1]

This action arises out of Hershey's leafleting activities on and near the campus of
Lehman, a senior liberal arts college in the CUNY system.  Hershey is a vegetarian advocate
who devotes much of his time to distributing free, educational booklets advocating the supposed
ethical and nutritional benefits of a plant-based diet.  Specifically at issue in this action are two
distinct but related instances of leafleting on May 16, 2011:  Hershey's leafleting (1) on a main

---

[1] The Court's account of the underlying facts is drawn from Hershey's Amended Complaint,
Dkt.14 ("Am. Compl."), his Memorandum of Law in Opposition to Defendants' Motion to
Dismiss, Dkt. 21 ("Hershey Br."), and a compact disc containing security camera footage of
events described in the Amended Complaint, which was filed as Exhibit B to the Declaration of
William J. Taylor, Jr. in Support of Defendants' Motion to Dismiss the Amended Complaint,
Dkt. 17 ("Taylor Decl.").  Hershey references this video footage in the Amended Complaint, *see*
Am. Compl. ¶¶ 96–106, and attached some of this footage to it.  Hershey affirmatively noted in
his brief that the Amended Complaint incorporates these videos by reference.  Hershey Br. 2.
The Court can consider this video footage in deciding the motion to dismiss.  *See Blue Tree
Hotels Inv. v. Starwood Hotels & Resorts*, 369 F.3d 212, 217 (2d Cir. 2004) (permitting
consideration of "any documents that are either incorporated into the complaint by reference or
attached to the complaint as exhibits"); *see also Garcia v. Bloomberg*, 865 F. Supp. 2d 478, 483
n.1, 492 (S.D.N.Y. 2012) (holding that videos incorporated by reference into the complaint can
be considered in deciding a motion to dismiss and crediting videos where "the videos themselves
rebut plaintiffs' allegations").

The video provided to the Court is time-stamped, silent, and broken into four segments:  (1) a
nine-minute clip filmed by one rotating security camera, from 10:31 a.m. to 10:40 a.m., zooming
in and out on Hershey leafleting on the campus walkway and then being approached by a public
safety officer, who escorts him away; (2) a three-minute clip filmed by one rotating camera, from
10:54 a.m. to 10:57 a.m., mainly showing a public safety officer escorting Hershey off of the
campus; (3) an 11-minute clip filmed by one rotating camera, from 11:07 a.m. to 11:18 a.m.,
zooming in and out on Hershey leafleting in front of the main campus gate and, after several
discussions with public safety officers, being arrested; and (4) a 12-minute clip filmed by one
rotating camera, beginning more than an hour and 20 minutes after his arrest, zooming in and out
on Hershey as he conversed with a New York City Police Department officer in his police car
and continued to leaflet in front of the main campus gate as campus public safety officers looked
on from their vehicles.  Taylor Decl., Exs. B–1–B-4.  In the context of a motion to dismiss, the
Court assumes the truth of Hershey's allegations, and draws all inferences in his favor.

walkway on Lehman's campus, and, immediately afterwards, (2) just outside the Lehman gates, which resulted in his being arrested for trespassing.  The Court reviews the facts underlying both the on-campus and off-campus leafleting activity in turn.  The Court also reviews later events relating to Hershey's post-arrest interactions with school officials regarding the preservation of evidence and Lehman's on-campus leafleting policy, and the criminal proceedings against Hershey stemming from his arrest.

### A.  On-Campus Leafleting Activity

On the morning of May 16, 2011, Hershey stationed himself on the main public walkway in the middle of Lehman's campus to hand out leaflets on behalf of a non-profit organization called Vegan Outreach.  Am. Compl. ¶¶ 13, 16.  Many students accepted leaflets from Hershey when passing by him on the walkway.  Taylor Decl., Ex. B-1.  As Hershey continued to distribute his leaflets, Public Safety Officer Edwin Freytes (a named defendant) approached Hershey and informed him that "he needed permission from the [Lehman] administration in order to hand out materials."  Am. Compl. ¶ 17.  Freytes clarified that he was not responding to any complaint about Hershey; upon Hershey's request, he escorted Hershey to defendant Vincent Zucchetto, Executive Assistant to the Vice President for Student Affairs at Lehman, whom Freytes identified as the appropriate person for Hershey to ask about obtaining permission to leaflet.  *Id.* ¶¶ 18–20.

Zucchetto refused to grant such permission.  *Id.* ¶ 21.  In fact, during his meeting with Hershey, Zucchetto represented to Hershey that "he was not allowed to leaflet on the Lehman College campus, and that the campus was private property."  *Id.*  Unconvinced, Hershey replied that Lehman was public and state-funded, and he requested from Zucchetto a copy of Lehman's on-campus leafleting policy.  *Id.* ¶ 22.  Zucchetto then directed Hershey that he would need to

make his request in writing, which Hershey offered to do while still in Zucchetto's office.  *Id.* ¶¶ 23–24.  However, Zucchetto stated that he would not respond to Hershey's request that day, and Freytes ordered Hershey to leave the office before he could briefly write out the request.  *Id.* ¶¶ 25–26.  Although denying Hershey permission to leaflet on campus, Zucchetto and Freytes represented to Hershey that he "had permission to hand out his booklets on the sidewalk outside any of the college's gates."  *Id.* ¶ 28.  After the meeting with Zucchetto, Freytes escorted Hershey off of the campus.  *Id.* ¶ 29; Taylor Decl. Ex. B-2.

### B.  Off-Campus Leafleting Activity

Hershey's off-campus leafleting activity is best explained in three parts: (1) his first stint of off-campus leafleting, and public safety officers' response thereto; (2) his arrest outside of the campus gates and detainment in the public safety office; and (3) his second stint of off-campus leafleting, following his arrest.

### 1.  Initial Off-Campus Leafleting and Public Safety Officer Response

After his meeting with Zucchetto, Hershey sought out the most student-accessible off-campus spot from which to hand out booklets.  *Id.* ¶ 30.  He settled on the intersection of Paul Avenue and Bedford Park Boulevard, occupying the sidewalk in front of Lehman's entrance.  *Id.* As made clear in the third and fourth video segments defendants filed with the Court, and which the Amended Complaint incorporates by reference, at this intersection sits a public sidewalk in front of, and running alongside, the main gate to campus.  *Id.* ¶ 34; Taylor Decl. Ex. B-3.  A driveway entrance to, and exit from, the campus crosses and is perpendicular to this sidewalk.  Am. Compl. ¶ 35; Taylor Decl. Ex. B-3.  Judging from the video, this intersection generates significant foot traffic, and, from time to time, vehicles turn onto the driveway to enter campus.  Taylor Decl. Ex. B-3.

Once situated, Hershey started to distribute his booklets, "peaceably," on the sidewalk in front of the campus gate.  Am. Compl. ¶ 31.  Instead of standing in one spot to leaflet, Hershey paced up and down the sidewalk, frequently crossing the driveway, Taylor Decl., Ex. B-3, to "approach[] individuals who were walking in the vicinity of the campus gate," Am. Compl. ¶ 32.  Hershey did not force leaflets onto anyone and "never pressed the issue" with uninterested passers-by.  Id. ¶ 33.

No more than 11 minutes after he started leafleting in front of the campus gate, Hershey was interrupted by campus authorities again.[2]  Id. ¶ 34.  Public Safety Officer Irizariz (a defendant) approached Hershey and told him that he "was not allowed to leaflet there," instead directing him to leaflet adjacent to a food cart several yards east of the main gate to campus.  Id.; Taylor Decl., Ex. B-3.  The food stand was on a bridge on Bedford Park, in a "narrow area" that Hershey did not find suitable for leafleting mainly because he did not want to cause any additional congestion or inconvenience to pedestrians.  Am. Compl. ¶ 56.  Hershey alleges that Irizariz's statement "had nothing to do" with the driveway's intersecting part of the area of the sidewalk on which Hershey was leafleting.  Id. ¶ 35.  Nor, Hershey alleges, did Irizariz offer him the option of leafleting on the public sidewalk west of the campus gate and driveway, in the opposite direction of the bridge and food cart.  Id. ¶ 36.  Hershey alleges that Irizariz's request "was entirely arbitrary," and that "no explanation was given as to why [Hershey] should have to leaflet" on a narrow walkway next to a food truck (which, contrary to Hershey's precepts, served

---

[2] The Court cannot determine the exact length of time that transpired between Hershey's beginning to leaflet in front of the gate and the first safety officer interruption because there is an unaccounted-for, 10-minute gap between the second and third videos.  The second video clip, where Hershey is escorted off campus through the main gate, ends at 10:57 a.m., Taylor Decl., Ex. B-2; but the third video clip—which shows Hershey having already started to leaflet in front of the main gate—begins at 11:07 a.m., id., Ex. B-3.  Hershey is first approached at 11:08 a.m. Id; see also infra Part I.C.1 for a discussion of Hershey's video spoliation claims.

meat).  *Id.* ¶ 37.  Hershey also claims that leafleting in this "constricted" area "might potentially cause congestion of pedestrian traffic and inconvenience to pedestrians, which [Hershey] specifically did not want to do."  *Id.* ¶ 56.  Accordingly, Hershey told Irizariz that "he was within his rights to leaflet" where he had been leafleting, and he continued to distribute his materials in the same spot.  *Id.* ¶ 38.

Following this exchange, Public Safety Lieutenant Cruz (a defendant) approached Hershey and repeated Irizariz's order that Hershey "needed to stand by the food stand."  *Id.* ¶¶ 39–40.  Hershey alleges that this directive was arbitrary, unrelated to the driveway's intersecting the sidewalk in front of the gate, and that Cruz did not offer him the option to leaflet west of the gate.  After Cruz left, Hershey alleges, he moved to the west of the gate.  *Id.* ¶¶ 41–44.[3]

### 2.  Hershey's Arrest and Detainment

A few minutes later, a team of public safety officers, including Cruz, Freytes, Irizariz, and Public Safety Sergeant Gallan (all defendants) pulled up to the intersection in front of the gate in sports utility vehicles, got out of their cars, and surrounded Hershey, who was standing to the west of the gate and driveway area.  *Id.* ¶¶ 45–46.  Cruz advised Hershey that he would be arrested if he did not leave.  *Id.* ¶ 47.  Hershey allegedly replied that he was standing on a public New York City sidewalk, not Lehman property, and that "he had a First Amendment right to peaceably hand out his literature on that public sidewalk."  *Id.* ¶ 48.  He also requested that he and the public safety officers call the New York City Police Department to clarify this point.  *Id.*

---

[3] Although Hershey did move west of the driveway after speaking with Cruz, the video shows that he remained stationed very close to the driveway—in fact, immediately after his first discussion with Cruz, one vehicle turning into campus made an extra-wide turn, presumably as a precaution to avoid a potential collision or near-collision with Hershey.  Taylor Decl., Ex. B-3.

¶ 49.  Cruz replied that "that was what they were going to do (i.e., call the New York City Police Department)."  *Id.* ¶ 50.

However, Hershey alleges that their discussion morphed into a forcible and unlawful arrest.  He claims that Irizariz "forcibly grabbed" him while Cruz "forcibly grabbed" his booklets, confiscating them from him and handing them to Gallan.  *Id.* ¶¶ 50–51.  The officers then handcuffed Hershey and escorted him to Lehman's public safety office, where they searched him and his property without his consent and read "private documents" which they took from his pockets," *id.* ¶¶ 53, 59–60, despite Hershey's twice protesting that they were violating his Fourth Amendment rights, *id.* ¶¶ 52, 61.  Hershey also alleges that the officers had placed the handcuffs on him "with an excessive and painful tightness" and asked the officers to remove or loosen them because his hands "were tingling." *Id.* ¶¶ 62–63.  The officers allegedly ignored this request, as well as two other requests to remove or loosen his handcuffs.  *Id.* ¶¶ 64, 70, 76.

Hershey further alleges that at no time during the arrest, or the events leading up to it, did any officer claim that he was blocking the driveway or traffic.  *Id.* ¶ 54.  In fact, Hershey claims, he never blocked, or intended to block, any traffic—vehicular or pedestrian—while leafleting, *id.* ¶¶ 55, 58; ironically, he contends, the public safety officers obstructed pedestrian traffic when they parked their vehicles in front of the gate for more than six minutes, *id.* ¶ 56.

Hershey maintains that the officers held him in handcuffs in the public safety office for approximately one hour, inquiring about his affiliations and deciding on an appropriate charge before issuing him a summons.  *Id.* ¶¶ 65–67, 75–76.  Irizariz asked whether he "was involved with [People for the Ethical Treatment of Animals (PETA)]" or any other organizations; Hershey stated that his only relevant affiliation was with Vegan Outreach, for which he had been leafleting that day.  *Id.* ¶¶ 65–68.  Hershey again explained to Irizariz that he "had a First

Amendment right to leaflet on the City sidewalk," *id.* ¶ 72, to which Irizariz replied that he was "just complying with his supervisors' directives," *id.* ¶ 74.

The officers issued Hershey a summons for trespass, pursuant to § 140.05 of the New York State Penal Law, which was signed by Freytes. *Id.* ¶¶ 76–77. After issuing the summons, the officers removed the handcuffs from Hershey, whose "wrists were bright red from the[ir] excessive tightness." *Id.* ¶ 79. Hershey instructed Cruz to take note of the red marks, and "Cruz stated, without interest, that she saw the marks." *Id.* ¶¶ 80–81. Finally, before leaving the public safety office, Hershey warned the officers not to destroy any video surveillance tapes because they would "be needed for use in court." *Id.* ¶ 82. Freytes then escorted him off campus for the second time that day. *Id.* ¶ 83.

### 3. Post-Arrest Leafleting and Handcuff-Related Pain

Later that afternoon, undeterred by his arrest and receipt of a summons, Hershey returned to the same spot where he had been arrested, and telephoned the New York City Police Department which, per Hershey's request, dispatched NYPD Officer Perez to his location. Perez allegedly confirmed that Hershey had a right to leaflet at the intersection of Paul Avenue and Bedford Park Boulevard—the intersection at which the public safety officers had objected to his presence—and told Hershey that he would "have a word with the campus public safety officers." *Id.* ¶ 85. Hershey then told Perez that he planned to continue leafleting there, and Perez nodded with approval. *Id.* ¶ 86.

For the next hour-and-a-half, Hershey handed out his booklets without further incident, as various public safety officers, including Irizariz, watched from their vehicles; however, the pain in his hands from the allegedly tight handcuffs made it difficult for Hershey to distribute his booklets. *Id.* ¶¶ 87–89. Hershey alleges that he "continued to experience paresthesia in his

hands from the extended period of time during which he had been held in excessively tight handcuffs," prompting him to "drop his booklets that he was attempting to hand out." *Id.* ¶ 89. This discomfort, combined with the less efficient, off-campus location and the time he had lost during his interactions with public safety officers and his arrest, eventually led Hershey to discontinue his leafleting efforts that day. *Id.* ¶ 90. Hershey claims that he continued to suffer from this paresthesia in his hands for the next three weeks and was unable to leaflet again, after attempting to do so the next day, until June 11, 2011. *Id.* ¶¶ 91, 108.

### C. Hershey's Follow-Up with School Officials and Allegations of Video Spoliation

In the days following his arrest, Hershey sought to preserve related evidence and inquire more fully and formally about Lehman's on-campus leafleting policy. He now alleges that (1) some related video surveillance evidence was spoliated, and that (2) Lehman has no written policy governing leafleting on campus by outsiders.

### 1. Video Spoliation

On May 20, 2011, four days after his arrest, Hershey e-mailed the Lehman Director of Public Safety, Domenick A. Laperuta (a defendant), and told him to preserve any video surveillance records from May 16, 2011, between 10 a.m. and 3 p.m. *Id.* ¶¶ 96–97. On July 21, 2011, Laperuta "acknowledged," by e-mail response, that "he had complied with the preservation notice." *Id.* ¶ 98.

Nonetheless, Hershey alleges that "significant portions of video have been spoliated by Defendants." In support of this claim, he notes that the third and fourth video segments defendants filed with the Court "begin to run with [Hershey] *already* present and leafleting outside of the College gates," *id.* ¶ 102; and the fourth segment ends while he is still leafleting, *id.* ¶ 103. As such, he argues that meaningful portions of video footage—including of his

telephoning the New York Police Department, interacting with Lopez, and dropping booklets due to paresthesia—have been spoliated.  *Id.* ¶¶ 104–106.

### 2.   Hershey's Inquiry into Lehman's Leafleting Policy

Hershey also sought clarification of Lehman's policy on literature distribution on campus.  He twice wrote Zucchetto requesting a copy of such a policy, but Zucchetto did not respond.  *Id.* ¶ 109.  He also wrote Jose Magdaleno, the Vice President for Student Affairs, to describe his leafleting experiences and request a copy of the college policy.  *Id.* ¶ 110.  Magdaleno allegedly referred the matter to defendant Esdras Tulier, Special Counsel to Ricardo Fernandez, President of Lehman, who is also a defendant.  *Id.* ¶ 111.  Hershey wrote separately to Fernandez, who never responded.  *Id.*  ¶¶ 112–113.  Finally, Hershey made a Freedom of Information Law (FOIL) request, asking for a copy of Lehman's policy on literature distribution. *Id.* ¶ 114.

Ultimately, Hershey alleges, Lehman responded that it had an unwritten policy prohibiting outsiders from leafleting on campus.  On June 13, 2011, Tulier e-mailed Hershey, pursuant to his FOIL request, and stated:

> Lehman College has a long-standing practice of prohibiting distribution of flyers, within College property, by persons who are not members of the College community.  Further, if someone, not connected with the College, wishes to distribute flyers on campus, he/she will be directed to do so outside of the College property line.

*Id.* ¶ 115.  However, in response to Hershey's subsequent request for a written copy of a policy memorializing this "long-standing practice," Tulier noted that that practice "is not in the form of a written policy."  *Id.* ¶¶ 116–117.  Indeed, Hershey notes that two months before his leafleting at Lehman, another representative of Vegan Outreach, Eileen Botti, had received a similar response from Lehman and the public safety office after she attempted to leaflet on walkways on

campus.  *Id.* ¶ 125.  Botti, like Hershey, was initially told by a campus public safety officer that she "needed permission to leaflet on campus," and only after she spoke with Zucchetto was she informed that she would be prohibited from leafleting on campus grounds.  *Id.* ¶ 126.  Zucchetto also ignored Botti's request for a written policy.  *Id.* ¶ 127.

In his Amended Complaint, Hershey suggests that this unwritten policy contradicts Lehman's formal commitment to freedom of speech, as spelled out in Lehman/CUNY Policies and Procedures, chilling his First Amendment rights.  Section IV-D (Freedom of Speech) states, as quoted in Hershey's Amended Complaint:

> Freedom of speech is an essential tradition of any academic community.  All members of the Lehman community must be vigilant in exercising their rights of expression so as not to preclude other persons' guaranteed right to give and receive expression as part of the deliberative process of the academic community.

*Id.* ¶ 118.  Hershey specifically intends to return "to both the Lehman College campus, and to the City streets that surround it (as well as to other colleges within the CUNY system), to again leaflet."  *Id.* ¶ 128.  He also claims that as a result of his experiences, he "has been, and remains, chilled from exercising his First Amendment rights on and around the Lehman College campus," as well as on or around the campus of any college within the CUNY system.  *Id.* ¶ 131.

### D.  Criminal Proceedings Stemming from Hershey's Arrest

Hershey pled not guilty to the trespass charge and defended himself against it.  After returning the summons, he contacted the New York Civil Liberties Union (NYCLU), which in turn asked Laperuta, in light of his officers' alleged violations of Hershey's First Amendment rights, whether he was planning to pursue the charge.  *Id.* ¶ 120.  Laperuta replied in the affirmative, *id.* ¶ 121, and Hershey received instructions to appear in court in person on July 21, 2011.  When he appeared at the Criminal Court, the Court Clerk gave him a document informing

him that Lehman College/CUNY Office of Public Safety "has failed to file a legally acceptable accusatory instrument with this court." *Id.* ¶ 124.

A resident of St. Louis, Missouri, Hershey alleges to have endured substantial inconvenience and expense in defending against an allegedly frivolous charge that Lehman and the CUNY Office of Public Safety failed to prosecute. Namely, he was forced to fly back to New York from Missouri, rent a hotel room, and incur other related expenses, in order to appear in court. *Id.* ¶ 123.

### E.  Procedural History

On May 15, 2012, Hershey filed the original Complaint in this action. Dkt. 1. On August 6, 2012, defendants moved to dismiss the Complaint, Dkt. 6, and filed a declaration in support thereof, Dkt. 7, containing the relevant security video footage discussed above.

On August 27, 2012, in response to defendants' motion to dismiss, Hershey amended his original Complaint. Dkt. 14.  The Amended Complaint recites eight causes of action grounded in defendants' alleged violation of his First and Fourth Amendment rights, stemming from prohibitions of his leafleting activity on Lehman's campus and just outside of the campus gates, as well as from his resulting arrest. The claims were for violations of rights under both the United States and New York Constitutions, and for supervisory liability, for false arrest and false imprisonment, assault and battery, malicious prosecution, abuse of process, and negligence.

On September 17, 2012, defendants moved to dismiss the Amended Complaint, pursuant to Rule 12(b)(6), and filed a supporting memorandum of law and a declaration attaching the same video footage. Dkts. 16–18. Defendants urge the Court to dismiss Hershey's First Amendment claims because (1) Lehman's campus is a "limited public forum" and Lehman lawfully could restrict the speech of an outsider like Hershey on campus grounds, and (2)

prohibiting him from leafleting in front of the campus gates was a reasonable, content-neutral, time, place, or manner restriction.  Defendants also contend that the defendant public safety officers had probable cause to arrest Hershey for trespass, that Hershey has failed to allege sufficient injury to state a claim under § 1983 for excessive force or under New York law for assault and battery, that his other claims fail as a matter of law, and that his claims against several defendants fail to allege the necessary personal involvement of each defendant.

On November 30, 2012, Hershey filed his opposition.  Dkt. 21.  He argues that the Court should treat Lehman's campus as a traditional public forum, in which it was unconstitutional to ban his leafleting, and that it was unreasonable to restrict his off-campus leafleting.  He also defends his other claims.  On December 7, 2012, defendants filed their reply.  Dkt. 23.

On December 14, 2012, the Court heard argument on the motion to dismiss.  *See* Transcript of December 14, 2012 Oral Argument ("Tr.").  On December 17, 2012, Plaintiff filed, with the Court's permission, *see* Dkt. 26, a sur-reply brief, addressing an aspect of defendants' forum analysis.  Dkt. 24.  On January 16, 2012, defendants responded to the sur-reply.  Dkt. 27.

## II.   Legal Standard on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   A district court must therefore accept as true all well-pleaded factual allegations in the complaint and draw all inferences in the plaintiff's favor.  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) ("We review the district court's grant of a Rule 12(b)(6) motion to dismiss *de novo*, accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.").   A complaint is properly dismissed where "the

allegations in a complaint, however true, could not raise a claim of entitlement to relief."

*Twombly*, 550 U.S. at 558.

A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. In addition, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, where the plaintiff's claims have not been "nudged . . . across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.   Discussion

The legal analysis proceeds in three parts. The Court addresses, first, Hershey's § 1983 claim that his First Amendment rights were violated by the prohibition of his on-campus leafleting; second, his claim that those rights were violated by the restriction on his off-campus leafleting, and that his arrest was unlawful; and third, Hershey's additional claims.

### A.   The On-Campus Leafleting Restrictions

Hershey argues that defendants violated his First Amendment rights by prohibiting him from distributing his booklets on the main walkway of Lehman's campus. In evaluating § 1983 claims for First Amendment violations, courts first inquire whether the activity in question is protected speech under the First Amendment. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) ("[I]f [the speech] is not [protected], we need go no further."); *Hotel Emps. & Rest. Emps. Union, Local 100 v. N.Y.C. Dep't of Parks & Rec.*, 311 F.3d 534, 544 (2d Cir. 2002). If it is protected, the Court then "must identify the nature of the

forum" to determine the level of constitutional scrutiny that applies to the speech, "because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797; *see also Hotel Emps.*, 311 F.3d at 544. Finally, the Court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius*, 473 U.S. at 797.

Hershey's alleged leafleting activity is a form of protected speech under the First Amendment, and defendants do not dispute the point. Def. Br. 10; *see also Hotel Emps.*, 311 F.3d 544 ("[L]eafletting [is] a form[] of speech protected under the First Amendment."). Accordingly, the Court turns to analyzing the forum in which that speech occurred.

### 1. Categorizing the Forum at Issue

When the government attempts to restrict constitutionally-protected speech on its own property, "the level of scrutiny to which the restriction is subjected depends on how the property is categorized as a forum for speech." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.* (*AFDI*), 880 F. Supp. 2d 456, 469 (S.D.N.Y. 2012), *appeal dismissed*, No. 12-3174 (2d Cir. Sept. 25, 2012). This forum analysis is a "means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes." *Cornelius*, 473 U.S. at 800. The Second Circuit has sorted government property into four forum classifications. Ranging from those triggering the highest level of scrutiny to the least, these are: (1) traditional public fora, (2) designated public fora, (3) limited public fora, and (4) nonpublic fora. *See R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 422 (2011); *Hotel Emps.*, 311 F.3d at 544–46. After determining the type of forum at issue, the Court "then applies the

requisite standards for that forum to the challenged speech restriction." *AFDI*, 880 F. Supp. 2d at 469.

The first category, the traditional public forum, encompasses unmistakably public areas, such as streets and parks, "which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Pleasant Grove City, UT v. Summum*, 555 U.S. 460, 469 (2009) (internal citations and quotation marks omitted); *see also N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 (2d Cir. 1998). In such a forum, content-based speech restrictions must survive strict scrutiny, meaning that the restriction in question must be narrowly tailored to serve a compelling government interest. *Pleasant Grove City*, 555 U.S. at 469; *Hotel Emps.*, 311 F.3d at 545. The government may properly implement content-neutral time, place, and manner restrictions, but these must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). In determining whether a forum should be designated as public, a court should consider "how the locale is used," as well as the "government's intent in constructing the space and its need for controlling expressive activity on the property, as evidenced by its policies or regulations." *Hotel Emps.*, 311 F.3d at 547; *see Jones v. N.C. Prisoners' Labor Union*, 443 U.S. 119, 130 (1977) (noting, for example, that a prison is not a public forum for inmates because their freely exercising First Amendment rights would conflict with the "legitimate operational considerations of the institution").

The second category, the designated public forum, "refers to government property which, although not a traditional public forum, has been 'intentionally opened up for that purpose.'" *AFDI*, 880 F. Supp. 2d at 469 (quoting *Christian Legal Soc.'y v. Martinez*, 130 S.Ct. 2971, 2984

n.11 (2010)); *see also Cornelius*, 473 U.S. at 802; *N.Y. Magazine*, 136 F.3d at 128–29. "Because the government, as property owner, has opened up a designated public forum to the same breadth of expressive speech as found in traditional public forums, the same standards apply:  Any content-based restrictions on speech must survive strict scrutiny, meaning they must be narrowly tailored to serve a compelling government interest, and content-neutral time, place, and manner restrictions are permissible only if they are narrowly tailored and leave open other avenues for expression." *AFDI*, 880 F. Supp. 2d at 469 (citing *Pleasant Grove City*, 555 U.S. at 469–70); *see also Int'l Action Ctr. v. City of N.Y.*, 587 F.3d 521, 526–27 (2d Cir. 2009) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, (1989)); *Hotel Emps.*, 311 F.3d at 545.

The third category, the limited public forum, is often analyzed as a subset of the designated public forum and as a nonpublic forum opened up for specific purposes. *See Byrne v. Rutledge*, 623 F.3d 46, 55 n.8 (2d Cir. 2010) ("[T]he law of [the Second Circuit] describes a limited public forum as both a subset of the designated public forum and a nonpublic forum opened to certain kinds of speakers or to the discussion of certain subjects." (internal quotation marks and citations omitted)).  The government has opened up limited public fora for some speech, but these fora are "'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'"  *Christian Legal Soc'y*, 130 S.Ct. at 2984 n.11 (quoting *Pleasant Grove City*, 555 U.S. at 470).  Common examples of limited public fora include "state university meeting facilities opened for student groups, open school board meetings, city-leased theaters, and subway platforms opened to charitable solicitations."  *AFDI*, 880 F. Supp. 2d at 470 n.6 (quoting *Hotel Emps.*, 311 F.3d at 545).  "The government has more leeway to restrict speech in a limited public forum than in a traditional or designated public forum," *id.*; however, speech restrictions in a limited public forum must be viewpoint-neutral and reasonable in light of the

forum's purpose.  *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius*, 473 U.S. at 806.

The final category, the nonpublic forum, consists of property that "the government has not opened for expressive activity by members of the public."  *Hotel Emps.*, 311 F.3d at 546; *see also Perry Educ. Ass'n*, 460 U.S. at 45–46.  Examples of nonpublic fora include airport terminals, government-owned professional sports stadiums, military bases and restricted access military stores, and jailhouse grounds.  *Hotel Emps.*, 311 F.3d at 546 (collecting cases). Restrictions on speech in such fora must only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Cornelius*, 473 U.S. at 800; *Hotel Emps.*, 311 F.3d at 546 ("The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality.").

### 2.  Forum Analysis

The parties vigorously disagree over how to classify Lehman's campus.  Hershey urges the Court, relying almost exclusively on a concurrence in an Eighth Circuit opinion, to hold the campus a traditional public forum, or, at minimum, a designated public forum.  Hershey Br. 7. Defendants counter by pointing to a line of cases holding that college campuses are not traditional or designated public fora.  It urges that the Lehman campus is a limited public forum. Def. Br. 12.  The Court agrees with the defendants' assessment.

The Court begins by recognizing that "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum."  *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).  Accordingly, the Second Circuit has noted, "[s]ome portions of a public

college's campus may be a public forum." *Davis v. Stratton*, 360 F. App'x 182, 184 (2d Cir. 2010).  Significant to the analysis, however, is that these areas may constitute a designated public forum only to the extent they are "intentionally open[ed]" to First Amendment activities.  *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004); *see also Ochshorn*, 645 F.3d at 540 (holding that a public high school newspaper was a limited public forum, not a traditional or designated public forum, because there was no evidence that the school permitted "indiscriminate use by the general public" (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988))); *Hotel Emps.*, 311 F.3d at 545 (noting that a designated public forum is one intentionally "opened for all types of expressive activity").  For this reason, although parts of a college campus may be a designated public forum if the government or university so intends, a "[public college's] campus is not the village green." *Davis*, 360 F. App'x at 184.[4]  Indeed, in *Widmar*, the Supreme Court noted that "[w]e have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings."  454 U.S. at 267 n.5.  Since then, no court has held that a university's campus is, in its entirety, a traditional public forum.

Hershey cites extensively to a concurring opinion in *Bowman v. White*, 444 F.3d 967, 983 (8th Cir. 2006) (Bye, J., concurring), to advance a policy argument that courts ought to classify public college campuses as traditional public fora.  Hershey embraces Judge Bye's thesis that "there is no reason students who may or may not pay tuition and who may or may not live on

---

[4] Following argument, Hershey filed a sur-reply letter claiming that defendants misleadingly cited *Davis* in their reply brief.  Hershey asserts that defendants relied improperly on *Davis* because they quoted in their brief that a "campus is not the village green," while leaving out qualifying language that preceded the quotation, which stated that "[s]ome portions of a public college's campus may well be a public forum." Hershey Sur-Reply 1–2.  However, as defendants fairly counter, that does not mean that a public college campus is a traditional public forum, or even a designated public forum, without its having been intentionally opened to expressive activity such as leafleting.  Def. Response Ltr. 1–2.

campus should have more expressive rights upon a campus street than should non-students who directly support the public university with tax dollars." *Id.* at 988. Judge Bye noted that streets, sidewalks, or parks on public college campuses were created as "marketplace[s] of ideas," "historically used by all members of the public" to express themselves; he urged that campus spaces worthy of public forum classification are "public thoroughfares open to public access" that have "historically been [used] for expressive and non-expressive activities by both University and Non-University entities." *Id.* at 986. On the basis of this reasoning, Hershey argues that Lehman's campus is a traditional public forum.

More narrowly, Hershey argues that, at a minimum, the walkway on which he handed out booklets should be held a designated public forum. He notes that leafleting there is a minimally disruptive activity and compatible with the forum. *See Hotel Emps.*, 311 F.3d at 555 (describing disruptiveness as a factor to consider in examining governmental restrictions on leafleting). For this reason, consistent with Hershey's argument, courts have held such places as the grounds of a sports arena, the Port Authority Bus Terminal, and an airport terminal as designated public fora in which leafleting by outsiders should not be banned outright. *Id.* (collecting cases). Hershey argues that because Lehman's walkways are "entirely compatible with leafleting," and that Lehman would "inherently benefit from a robust exchange of ideas, and exposure to new and different ideas," this space is a designated public forum. Hershey Br. 13–14.

Whatever the merits of Hershey's arguments as a matter of policy, however, they fail as a matter of law. First, to the extent Hershey argues broadly that the entire Lehman campus is a traditional public forum, this Court is persuaded by the great quantity of case law holding otherwise. The Supreme Court's decision in *Widmar* found the state university meeting facilities in question to be a limited public forum. 454 U.S. 263 at 276; *see also Bronx Household of*

*Faith v. Bd. of Educ. of City of N.Y.*, 226 F. Supp. 2d 401, 418 & n.12 (S.D.N.Y. 2002)

(collecting cases), *aff'd*, 331 F.3d 342 (2d Cir. 2003).  A uniform bloc of cases since has declined

to hold a college campus in its entirety to be a traditional public forum.  *See Bloedorn v. Grube*,

631 F.3d 1218, 1232 (11th Cir. 2011) ("[A] state-funded university is not a traditional public

forum."); *Gilles v. Garland*, 281 F. App'x 501, 511 (6th Cir. 2008) ("Plaintiff has failed to

persuade us to depart from the great weight of authority, which has rejected the notion that open

areas on a public university campus are traditional public fora."); *ACLU v. Mote*, 423 F.3d 438,

444 (4th Cir. 2005) (finding that university policy allowing outsiders to leaflet only in certain

locations and only after reserving the space created a limited public forum); *McGlone v. Cheek*,

No. 3:11-cv-405, 2012 WL 523659, at *8 (E.D. Tenn. Feb. 15, 2012) ("[T]he Court finds that the

open areas of UT's campus are limited public fora, and UT may make restrictions on speech

therein . . . ."); *Bourgault v. Yudof*, 316 F. Supp. 2d 411, 419 (N.D. Tex. 2004) ("[N]o court has

found a university's campus to be a traditional public forum."), *aff'd*, 157 F. App'x 700 (5th Cir.

2005).

Second, Hershey has not sufficiently alleged that Lehman's campus was "intentionally

opened" to all types of expressive activity or for "indiscriminate use[s] by the general public,"

prerequisites to establishing a designated public forum.  *See Ochshorn*, 645 F.3d at 540; *Hotel

Emps.*, 311 F.3d at 545; *Make the Road*, 378 F.3d at 143.  Hershey relies on Judge Bye's

judgment that a campus was "intentionally opened" because it is akin to a public street or

sidewalk and inherently benefits from free expression.  *See Bowman*, 444 F.3d at 988

("Wherever a public street or sidewalk runs, it is presumed to be a traditional public forum. . . .

There is, therefore, no reason to apply a different level of scrutiny to a street, sidewalk or park

which happens to fall within the boundaries of a public university than to one owned by a

municipality." (citation omitted)).  Hershey also notes that "various individuals" use the campus walkways, including "both members and non-members of the College community alike," and they "all stand to be enriched" from leafleting on those walkways.  Hershey Br. 14.

But these arguments do not carry the day.  The Second Circuit confronted a similar claim in *Hotel Employees*.  There, it held that Lincoln Center's fountain plaza was not a traditional or designated public forum, and upheld a ban on leafleting there.  The Second Circuit noted that, "despite the fact that the Plaza's design encourages passers-by to enter and pass through the Plaza, by restricting organized expression to arts-related presentations, the City has evidenced an intent to conserve the Plaza's function as an extension of the performing arts complex," not as a hub for expressive activity.  *Hotel Emps.*, 311 F.3d at 551.  Similarly, that Lehman may "invite[] passers-by to stroll through or linger" does not mean that Lehman created it "primarily to operate as a public artery" or "to provide an open forum for all forms of public expression."  *Id.* Hershey's allegations do not afford a basis to conclude that Lehman intended otherwise, or that its campus serves as an unrestricted forum for leafleting, demonstrations, or other forms of speech.  The campus setting is thus different from that of an airport terminal, which can function as "'shopping mall as well as an airport,'" such that "banning the distribution of leaflets [in it] was not 'reasonably related to maintaining the multipurpose environment' that the government had created," *id.* at 555 (quoting *Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 689 (1990)).  Rather, as the Seventh Circuit has recognized, a college campus serves a narrower purpose, and outside visitors are not automatically welcomed as invitees, as at a shopping mall, but are more properly viewed as "classic licensees," subject to reasonable restrictions.  *Gilles v. Blanchard*, 477 F.3d 466, 472 (7th Cir. 2008).

Specifically, "a university's mission is education and the search for knowledge," *Bowman*, 444 F.3d at 978, and accordingly it serves as "a 'special type of enclave' that is devoted to higher education," *Mote*, 423 F.3d at 444 (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)), with a right to "control [its] property," *Blanchard*, 477 F.3d at 471.  This right is particularly important to a state-funded university such as Lehman because "public and private universities compete with each other, [so] courts hesitate to impose in the name of the Constitution extravagant burdens on public universities that private universities do not bear."  *Id.* In striving to fulfill its educational mission, a public university has a strong interest in "preserving its limited facilities and resources for its [many] students, its faculty, and its employees."  *Bloedorn*, 631 F.3d at 1235.  Lehman sought to promote that interest through "a long-standing practice of prohibiting distribution of flyers, within College property, by persons who are not members of the College community."  Am. Compl. ¶ 115.  There are many possible justifications for such a policy—*e.g.*, reducing campus congestion, maintaining a quiet environment for study, or giving students more space to hand out flyers for their student groups—but the Court need not inquire as to Lehman's specific reasons for it:  The manner in which Lehman decides to limit outsider access to campus areas deserves appropriate deference. *See Christian Legal Soc'y*, 130 S. Ct. at 2988 ("Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review." (internal citation and quotation marks omitted)). Therefore, Lehman's policy of restricting outsiders from leafleting on the campus of a university devoted specifically to higher education, and seeking to serve narrow constituencies—primarily, students and faculty—was reasonable.

Lehman has adopted this policy for its entire campus, which includes the walkway, and the Amended Complaint does not allege facts indicating that Lehman purposefully made that walkway available to campus outsiders for unrestricted expressive activities.  Quite the contrary: The only other instance alleged by Hershey in which an outsider sought to leaflet there led to a similar exclusion.  Hershey alleges that a fellow Vegan Outreach colleague was told by a campus safety officer that she needed permission to leaflet on the same walkway—a statement which itself presupposes a Lehman policy in which such speech by outsiders was subject to restriction. Like Hershey, was ultimately denied such permission.  Am. Compl. ¶¶ 125–127.  Hershey does not, in fact, identify any instance in which a campus outsider has ever been allowed to leaflet anywhere on Lehman's grounds.

Hershey therefore does not allege facts sufficient to support his claim that the Lehman campus in general, or the walkway in particular, was a traditional or designated public forum.[5] *See, e.g.*, *Blanchard*, 477 F.3d at 472 (holding a college library lawn was not a designated public forum for expressive activity where the court was "given no instance of an outsider's being permitted to do more than stroll on the lawn").  Lehman's campus and walkway are thus not fairly pled to be such.

In an alternative argument, Hershey asserts that, even if Lehman's campus or walkways were held to be limited public or nonpublic fora, school administrators have impermissibly

---

[5] Hershey assails Lehman's policy regarding outsiders' leafleting on campus as vague, because it is unwritten, but "courts look not only to a government's stated policy, but also to its actual practice, in determining whether the government has created a designated public forum and, if so, what the contours of that forum are."  *E. Timor Action Network, Inc. v. City of N.Y.*, 71 F. Supp. 2d 334, 345 (S.D.N.Y. 1999) (citing *Cornelius*, 473 U.S. at 802).  As noted, Hershey alleges only two instances in which Lehman was confronted with an outsider seeking to leaflet on campus, and in both, Lehman prohibited such leafleting on campus.  The Amended Complaint thus alleges a consistent practice by Lehman of prohibiting outsider leafleting on the campus walkway.

"engage[d] in a case-by-case exercise of standard-less discretion as to which 'outsider' leafleters it will permit on the campus." Hershey Br. 15 & n.9; *see also* Tr. 10. Hershey's basis for this contention is that he allegedly received mixed messages as to the nature of that policy, in that Officer Freytes told Hershey that to leaflet he needed permission from Lehman administrators (specifically Zucchetto), *see* Am. Compl. ¶¶ 17–20, whereas Zucchetto ultimately articulated what Hershey understood to be a blanket ban on leafleting by all outsiders, *id.* ¶ 21. Hershey alternatively suggests that these facts indicate that the denial to him of permission to leaflet was, impermissibly, based on his vegan viewpoint.

To be sure, the inconsistent articulations by Officer Freytes and administrator Zucchetto as to the practical operation of Lehman's restrictions on leafleting by outsiders—at least as alleged in the Amended Complaint—are troubling. Lehman would be well served by articulating clearly whether its policy as to leafleting by outsiders is categorical (as Zuchetto is alleged to have indicated) or rather whether Lehman requires advance permission subject to certain standards. *See Garland*, 281 F. App'x at 507 ("[T]he limiting practice must be well understood and uniformly applied." (internal quotation marks and citation omitted)); *Hotel Emps.*, 311 F.3d at 545–46.

But the bare fact that the policy was described in differing terms by a Lehman safety officer and a school administrator does not give rise to a First Amendment claim by Hershey. To the extent Hershey suggests he was denied permission to leaflet on account of his viewpoint, he does not articulate any facts to support that conclusion. And to the extent Hershey's claim is grounded in the inexact articulations he received as to Lehman's policy, that alone does not give rise to a claim. "A policy need not be reduced to writing to survive [a] vagueness challenge," *Garland*, 281 F. App'x at 507, and, as noted, Hershey fails to allege any facts that Lehman's

policy was applied inconsistently or honored in the breach.  Rather, the only two instances

alleged in the Amended Complaint reflect a consistent denial of permission for such leafleting.

And even if Hershey had alleged an instance in which Lehman had acted otherwise, that alone

would not have made out a First Amendment claim.  In the context of a college campus, "[o]ne

unauthorized use of [a campus space] would not come close to establishing the absence of a

policy against use of [that space] by [outsiders]."  *Blanchard*, 477 F.3d at 472; *see also id.*

("Perfect past compliance with a rule is not a precondition to being allowed to continue

enforcing the rule.  Otherwise few rules could be enforced, and universities would have to fence

their open areas in order to limit access.").  Accordingly, the statements by a safety officer,

Freytes, suggesting that an outsider conceivably could be given permission to leaflet do not

salvage Hershey's claim.

Hershey thus has failed to show that Lehman's prohibition on his on-campus leafleting

violated his First Amendment rights.  To the extent his First Amendment claim is based on

Lehman's refusal to permit him to leaflet on campus, that claim is dismissed.

### B.  The Off-Campus Leafleting Restrictions

Hershey separately claims that CUNY's public safety officers violated his First

Amendment rights when they (1) directed him to leaflet only on the part of the sidewalk outside

the main campus gate that was alongside the food cart, and away from the part of the sidewalk

on which he preferred to leaflet; and (2) ultimately arrested him.  The legal analysis of that claim

differs from Hershey's claim relating to on-campus leafleting, because a public sidewalk is

undoubtedly a traditional public forum.[6]  Expression enjoys maximal protection in a traditional

---

[6] For purposes of this motion, the parties do not dispute that the sidewalk on which Hershey was
leafleting is a traditional public forum.  *See* Tr. 11; Def. Br. 16.  Defendants do note in a footnote
that a postal sidewalk used solely for the passage of individuals engaged in postal business is a

public forum.  *See Hotel Emps.*, 311 F.3d at 545; *AFDI*, 880 F. Supp. 2d at 469.  Although the government may impose content-neutral time, place, or manner restrictions, these must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Perry Educ. Ass'n*, 460 U.S. at 45 (collecting cases).  Hershey's First Amendment claim therefore turns on whether he has adequately pled that the leafleting restrictions imposed on him by the officers were other than permissible content-neutral time, place, or manner restrictions.

Several overarching principles guide this analysis.  First, "the government's ability to permissibly restrict expressive conduct is very limited."  *Grace*, 461 U.S. at 182; *see also Perry Educ. Ass'n*, 460 U.S. at 45 (in a traditional public forum, "the rights of the state to limit expressive activity are sharply circumscribed").  Second, the restriction in question must be carefully examined "to determine if it indeed promotes the Government's purposes in more than a speculative way."  *Cmty. for Creative Non-Violence v. Kerrigan* (*CCNV*), 865 F.2d 382, 390 (D.C. Cir. 1989) (citing *Grace*, 461 U.S. at 182); *see also Paulsen v. Cnty. of Nassau*, 925 F.2d 65, 71 (2nd Cir. 1991) (upholding invalidation of ban on leafleting where the government did not demonstrate sufficiently concrete fears over potential safety hazards resulting from "unrestrained leafleting").  Third, although a content-neutral time, place, or manner restriction "need not be the

---

non-public forum," Def. Br. 16 n.8 (citing *United States v. Kokinda*, 497 U.S. 720, 727–28 (1990) (plurality opinion)), but defendants do not suggest that such was the case here.  Rather, on the record before the Court at the pleadings stage, the sidewalk outside Lehman was an ordinary public sidewalk open to and utilized by the general public, not earmarked for any specific group, business, or limited purpose.  The driveway area intersecting the sidewalk was in turn traversed, and free to be traversed, by any pedestrian who walked along the sidewalk to the point where the driveway intersected the sidewalk.  The Supreme Court has "repeatedly referred" to public streets and sidewalks as "archetype[s] of a traditional public forum."  *Snyder v. Phelps*, 131 S. Ct. 1207, 1218 (2011) (quoting *Frisby v. Schultz*, 487 U.S. 474, 488 (1988)); *see also Marcavage v. City of N.Y.*, 689 F.3d 98, 104 (2d Cir. 2012) ("[S]idewalks of New York are the prototypical traditional public forum.") (internal quotation marks and citation omitted).

least restrictive or least intrusive means" of carrying out the government's valid interests, a time, place, or manner regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99 (1989). Fourth, the government may not distinguish between leafleters and general pedestrians without a valid basis for doing so; that is because "'freedom of expression . . . would rest on a soft foundation indeed if government could distinguish' between [leafleters] and pedestrians 'on a wholesale categorical basis' without providing evidence that [leafleters] pose a greater risk to identified government interests than do pedestrians." *Lederman v. United States*, 291 F.3d 36, 45 (D.C. Cir. 2002) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 101 (1972)).

This final factor is particularly relevant here. The videotape reflects that no other pedestrians who crossed the driveway while Hershey was present were intercepted or even momentarily detained by the public safety officers, whereas the officers approached Hershey several times when he strayed into the driveway and, allegedly, directed him to move towards the portion of the sidewalk alongside the food cart which Hershey regarded as less desirable for leafleting. Nor do defendants assert that Hershey's brief sojourns in the driveway, or for that matter on the portion of the sidewalk that he was ousted from in favor of the area near the food cart, posed any greater risk to public safety, or any other legitimate governmental interest, than did the sojourns of other passers-by. The D.C. Circuit's analysis of a similar problem in *Lederman* is instructive as to this claim. At issue there was a regulation that, in the name of enhancing safety and the flow of traffic, banned leafleting on the sidewalk at the foot of the Senate steps near the Capitol Building. *Id.* at 45–46. The court invalidated that regulation. To be sure, the regulation in *Lederman* was a blanket one—not a more limited, or *ad hoc,* time,

place, or manner restriction.  But the D.C. Circuit's rationale for invalidating it is equally applicable: that a leafleter on that highly-trafficked sidewalk did not pose a more substantial safety risk than any other type of pedestrian or passer-by.  The court stated:  "[A] single leafleteer standing on the East Front sidewalk will no more likely block traffic or threaten security than will photographers, star-struck tourists, and landscape painters complete with easels, but the Board has made no effort to keep any of these latter individuals away from the Capitol."  *Id.* at 45 (rejecting the proposition that "demonstrators of any stripe pose a greater security risk to the Capitol building and its occupants than do pedestrians, who may come and go anonymously, travel in groups of any size, carry any number of bags and boxes, and linger as long as they please").

As noted, the video evidence shows that, on May 16, 2011, numerous pedestrians entered the intersection in question, crossing the active driveway leading into the Lehman campus.  *See* Taylor Decl., Exs. B-3–B-4.  As the video illustrates, a driver, to enter or exit the campus, must therefore cross the path of pedestrians using the sidewalk, with either the pedestrians or the driver yielding to the other.  During the time period covered, the video reveals limited vehicular use of the driveway.  Hershey's sojourns into the driveway space to leaflet or wait for pedestrians were limited in time.  Hershey argues that it was arbitrary for the officers to insist that he (and he alone) move away from the driveway, and that it was arbitrary for them to insist that he move to a spot on the sidewalk alongside the food cart east of the driveway, as opposed to the spot on the sidewalk west of the driveway.  Hershey further alleges that he was never given an explanation for being asked to move.  Under these circumstances, he argues that there was no good reason for the public safety officers to redirect him in this fashion, and that the facts instead

suggest their actions were either arbitrary or retaliatory, arising out of his prior run-in with the officers on campus.

On a motion to dismiss, with all inferences required to be drawn in the plaintiff's favor, Hershey has sufficiently alleged that his First Amendment rights were violated when the officers interfered with his off-campus leafleting and when they ultimately arrested him.  At this early stage, the Court cannot determine whether the officers' alleged actions and statements restricting Hershey's leafleting, if established, were justifiable as content-neutral time, place, or manner restrictions narrowly tailored to serve the government's legitimate interests.  *See Ward*, 491 U.S. at 798–99; *Grace*, 461 U.S. at 181–82; *Paulsen*, 925 F.2d at 69–71; *CCNV*, 865 F.2d at 390.  On the face of the Amended Complaint, as corroborated by the video footage, Hershey has plausibly pled that no such justification existed for restricting his expressive activities, and that the officers' restrictions upon his leafleting, ultimately including his arrest, were prompted by the leafleting itself, not merely the fact that Hershey (like others) strayed into the driveway area.

In discovery, the Court expects the parties to elicit evidence both as to the events of May 16, 2011, as well as defendants' asserted justifications for any restrictions placed on Hershey that day, including his arrest.  Defendants are at liberty to attempt to establish that any leafleting restrictions were permissible.  *See, e.g.*, *Marcavage v. City of N.Y.*, 689 F.3d 98, 108–10 (2d Cir. 2012) (affirming grant of summary judgment in favor of government where prohibitions against expressive activity on a New York City sidewalk across from an arena were narrowly tailored to legitimate interests in security and in facilitating pedestrian traffic because protesters were openly "hostile and noncompliant" and "in effect . . . courted arrest").  But any such showing must await discovery:  Although defendants have cited cases upholding restrictions on expression within traditional or designated public fora, each was decided on a motion for

summary judgment or after a bench trial, based on a full record.  *See generally Marcavage v. City of Chi.*, 659 F.3d 626 (7th Cir. 2011); *Int'l Action Ctr. v. City of N.Y.*, 587 F.3d 521 (2d Cir. 2009); *Zalaski v. City of Hartford*, 838 F. Supp. 2d 13 (D. Conn. 2012).

Accordingly, defendants' motion to dismiss Hershey's § 1983 claim for violations of his First Amendment rights in connection with off-campus leafleting is denied.

## C.  Additional Claims Stemming from Hershey's Arrest

Hershey brings a number of claims arising out of his arrest, including for false arrest, false imprisonment, unlawful search and seizure, malicious prosecution and abuse of process, assault and battery, negligence, and violations of the New York Constitution.  The Court examines these claims in turn.

### 1.  False Arrest and False Imprisonment

Hershey brings claims for false arrest under § 1983, and for false arrest and false imprisonment under New York law, stemming from his arrest for trespass.  Under New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under § 1983.  *Dotson v. Farrugia*, No. 11 Civ. 1126 (PAE), 2012 WL 996997, at *7 (S.D.N.Y. Mar. 26, 2012) (collecting cases).

To state a claim for false arrest under § 1983, a plaintiff must plausibly allege that: "(1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified."  *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05 Civ. 6278 (RJS), 2009 WL 804096, at *7 (S.D.N.Y. Mar. 25, 2009) (citing *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991)).  "'The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.'"  *Dotson*, 2012 WL 996997, at *7 (quoting

*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  "'Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  *Jenkins v. City of N.Y*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852).

The parties here disagree whether the officers had probable cause to arrest Hershey for trespass, pursuant to New York Penal Law.  "A person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises."  N.Y. Penal Law § 140.05.  "A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a *lawful* order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person."  *Id.* § 140.00 (emphasis added).  "Premises" is defined as including "the term 'building' . . . and any real property."  *Id.*   To prove criminal trespass, the state must show that the "order not to enter or remain" was lawful, and therefore "must demonstrate that the particular order of exclusion had a legitimate basis and that, considering the nature and use of the subject property, its enforcement did not unlawfully inhibit or circumscribe the defendant from engaging in constitutionally or statutorily protected conduct."  *People v. Leonard*, 62 N.Y.2d 404, 411 (1984) (person who had been issued a "persona non grata" letter by a State University president banishing him from part of a college campus normally "open to the public" may not be convicted of trespassing for entering the campus when government failed to prove that the banishment order was lawful); *cf. Kalfus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 880 (2d Cir. 2012) (distinguishing *Leonard* and finding "lawful order" where plaintiff was arrested for trespass on private property).  When "the subject property is publicly owned and maintained, the People may

not satisfy their burden of proof on this issue by relying on a presumption that the public official authorized to maintain order on campus discharged his or her responsibility, in the particular instance, in a lawful manner." *Leonard*, 62 N.Y.2d at 411.

Here, defendants argue that a combination of Hershey's admissions in the Amended Complaint and the video evidence incorporated therein reveals that the officers had probable cause to arrest Hershey for criminal trespass. Def. Br. 21. Hershey, they note, admits having been told by the officers to move to the sidewalk alongside the food cart. Am. Compl. ¶¶ 34, 39–40. And the video, they argue, shows that after the officers communicated with him, Hershey did not do so, but instead repeatedly returned either to the driveway or to the sidewalk area west of it. Taylor Decl., Ex. B-3. Defendants thereby liken Hershey to leafleters whose arrests for trespass have been upheld where the leafleter ignored an officer's directions to relocate his or her leafleting activity. *See People v. Hedemann*, 438 N.Y.S.2d 172, 173 (Sup. Ct. App. Term 1st Dep't 1981) (finding probable cause for trespass arrest where defendant defied order not to leaflet in an Internal Revenue Service office); *People v. Reape*, 868 N.Y.S.2d 497, 499–500 (N.Y.C. Crim. Ct. 2008) (finding probable cause for arrest for failing to leave police precinct as directed).

Those authorities are, however, inapposite. As discussed above, Hershey has fairly pled that the officers' restrictions on him were *not* valid time, place, or manner restrictions. Pending discovery on that point and a resolution of it, it is altogether premature to hold that defendants had probable cause to arrest Hershey for trespass for violating a lawful order. Based on the pleadings, it is plausible that the evidence will establish that the officers' orders were not lawful, and therefore that, as in *Leonard*, the officers "unlawfully inhibit[ed] or circumscribe[d] the defendant from engaging in constitutionally or statutorily protected conduct." 62 N.Y.2d at 411;

*cf. People v. De Clemente*, 442 N.Y.S.2d 931, 935 (N.Y.C. Crim. Ct. 1981) (finding defendant

not guilty for trespass at Port Authority terminal because prohibiting "[i]nnocent entry upon the

Port Authority premises . . . is violative of an individual's right to travel freely").

There are additional impediments to finding that probable cause existed to arrest Hershey

for trespass.  As a legal matter, there is a substantial question whether a public sidewalk qualifies

as a "premises" within the meaning of the trespass statute.[7]  And, as a factual matter, there is a

substantial question whether Hershey "*knowingly* enter[ed] or remain[ed] unlawfully in or upon

[such] premises."  N.Y. Penal Law § 140.05 (emphasis added).[8]

To be sure, the facts known to the officers at the time of arrest conceivably might supply

probable cause to have arrested Hershey for a different offense.  Probable cause to arrest need

not be "predicated upon the offense invoked by the arresting officer, or even upon an offense

'closely related' to the offense invoked by the arresting officer."  *Jaegly v. Couch*, 439 F.3d 149,

153 (2d Cir. 2006).  In the event that probable cause to arrest for a trespass violation were found

lacking, the defendants would be at liberty to justify the arrest on other grounds supported by the

---

[7] "Premises" is defined as a "building" or "real property," neither of which describes a sidewalk.
N.Y. Penal Law § 140.00.  The cases on which defendants rely, by contrast, involved actual
premises.  *See Hedemann*, 438 N.Y.S.2d 172, 173 ("The use for which *the [IRS] office* was
intended was markedly more restricted than the use members of the public may usually make of
streets, parks, terminals, etc.—areas historically associated with the exercise of First Amendment
rights." (emphasis added)); *Reape*, 868 N.Y.S.2d 499–500 (sustaining trespass charge involving
failure to exit a police precinct).  The parties have not thoroughly briefed this issue.

[8] Hershey disputes that he knowingly remained in a place where he could not lawfully be.  The
Amended Complaint alleges that Hershey advised the officers "that he had a First Amendment
right" to hand out his booklets on the sidewalk.  Am. Compl. ¶ 48.  *See People v. Murphy*, 677
N.Y.S.2d 445, 448 (Dist. Ct. Nassau Cnty. 1998) ("It was reasonable for the defendant to
honestly believe that he had a license or privilege to be on the [sidewalk] and hand out his
literature.").  Hershey's state of mind presents a factual issue that cannot be resolved in
defendants' favor at this stage.

facts then known to them.  But at the pleadings stage, with the facts known to the officers as-yet unresolved, Hershey's arrest cannot be held valid as a matter of law.[9]

For these reasons, defendants' motion to dismiss the false arrest and false imprisonment claims must be denied.  It remains to be seen whether, at a later stage of this lawsuit, defendants can demonstrate the existence of probable cause.

### 2.  Unlawful Search and Seizure

Defendants also move to dismiss Hershey's § 1983 claim for unlawful search and seizure under the Fourth Amendment.  Def. Br. 22 n.13.  That claim challenges the search of his person incident to his arrest.  Because it remains unresolved whether Hershey's arrest was lawful, it is premature to resolve whether the search incident to it was also lawful.  The motion to dismiss this claim is, therefore, denied.

### 3.  Malicious Prosecution and Abuse of Process

Hershey brings claims for malicious prosecution and abuse of process, under § 1983 and New York state law.  "A Section 1983 claim for malicious prosecution is determined by reference to the elements of the related state tort."  *Rodriguez v. City of N.Y.*, No. 10 Civ. 4404 (PAE), 2012 WL 234380, at *3 (S.D.N.Y. Jan. 24, 2012) (citing *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010)).  Under New York law, the tort of malicious prosecution requires the plaintiff to show: "'(1) that the defendant commenced or continued a criminal

---

[9] Defendants posit that the officers had probable cause to arrest Hershey for obstruction of governmental administration ("OGA"), under New York Penal Law § 195.05.  But a person is guilty of OGA only if he "intentionally obstructs, impairs, or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . ."  N.Y. Penal Law § 195.05; *see Marcavage*, 689 F.3d at 109–10 & n.5.  Neither the pleadings nor the video evidence supports, let alone establishes, that Hershey intentionally obstructed the officers from performing their jobs "by means of intimidation, physical force or interference, or by means of any independently unlawful act."

proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice.'" *Id.* (quoting *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009)).  In addition, a federal claim under § 1983 for malicious prosecution requires the plaintiff to show that there was "a sufficient post-arraignment liberty restraint to implicate plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).  Finally, probable cause "acts as an absolute defense to a cause of action for malicious prosecution."  *Prowisor v. Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 171 (S.D.N.Y. 2006), *aff'd*, 232 F. App'x 26 (2d Cir. 2007).

For the reasons discussed, Hershey has plausibly alleged that probable cause was lacking for his arrest.  However, Hershey fails to plead facts supporting the second required element of malicious prosecution: that the proceeding was terminated in his favor.  Hershey contends that the proceeding against him initiated by the summons he received was discontinued when the Office of Public Safety "failed to file a legally acceptable accusatory instrument with the New York Criminal Court."  Am. Compl. ¶ 124; Hershey Br. 22.

Those facts, however, do not mean that the proceeding was terminated in Hershey's favor.  Where "there was no determination made on the merits" or "the matter was dropped in the interest of justice," without "evidence of any proceeding beyond the summons," a plaintiff cannot establish that the proceeding was terminated in his favor.  *Levy v. Alfano*, 47 F. Supp. 2d 488, 496 (S.D.N.Y. 1999); *see Hygh v. Jacobs*, 961 F.2d 359, 368 (2d Cir. 1992) (because "[a] dismissal 'in the interest of justice' is neither an acquittal of the charges nor any determination of the merits," but instead, "leaves the question of guilt or innocence unanswered," it cannot, "as a matter of law . . . provide the favorable termination required as the basis for a claim of malicious prosecution"); *see also Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("[T]his

Court has already held [in *Hygh*] that the New York Court of Appeals does not consider a dismissal in the interest of justice to be a favorable termination as a matter of law.").  Because Hershey has not pled that the proceeding against him was resolved in his favor based on any merits determination, his claims for malicious prosecution on federal and state grounds must be dismissed.

As for abuse of process, under both § 1983 and New York law, "a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."  *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).  The Amended Complaint recites these elements but does not allege facts indicating that the officers possessed harmful intent or an illegitimate collateral objective.[10] On the facts pled, Hershey has plausibly alleged an unlawful arrest, but has failed to allege these necessary ingredients for a claim for abuse of process to stand.  That claim must therefore be dismissed.

### 4.  Excessive Force and Assault and Battery

Hershey brings claims under § 1983 for use of excessive force, and under state law for assault and battery, stemming from his arrest.  These claims "are substantially identical."

---

[10] Hershey's brief attempts to add factual allegations, claiming that defendants (1) intended to harm him by "wanton[ly] inflict[ing] pain through excessively tight handcuffing for an extended period of time" and (2) acted out of retribution for his vegan beliefs.  Hershey Br. 23.  However, allegations in a brief are not sufficient to salvage deficient pleadings.  *See O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).  In any event, an improper motive, as opposed to an "ulterior collateral purpose or objective," is insufficient to establish the third element of abuse of process.  *Rhodes v. Tevens*, No. 07-CV-471S, 2012 WL 777421, at *10 (W.D.N.Y. Mar. 7, 2012) ("[T]he New York Court of Appeals has made clear that a malicious motive alone . . . does not give rise to a cause of action for abuse of process." (citing *Savino*, 331 F.3d at 77, and *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984))).

*Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quoting *Posr*, 944 F.2d at 94–95). Both require Hershey to show that the officers' use of force was "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of N.Y.*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Richardson*, 2009 WL 804096, at *10 (quoting *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986)).

These claims are based on Hershey's allegation of "excessively tight" handcuffing. Am. Compl. ¶ 89. He alleges that, after the handcuffs were removed, there were "red marks on his wrists," and that the handcuffing resulted in paresthesia in his hands that caused him to drop the leaflets he was distributing and prevented him from being able to leaflet for three weeks. *Id.* ¶¶ 62–64, 69–71, 75–76, 79–81, 89–90, 106–108. He alleges that all defendant officers played a role in his handcuffing, *id.* ¶ 89, and that he complained to them that the handcuffs were too tight and asked, to no avail, that they be removed or loosened, *id.* ¶¶ 63–64, 69–70.

Although "a line of cases have held that minor injuries that result from tight handcuffs, such as temporary swelling, inflammation or soreness of an arrestee's wrists, are insufficient on their own to sustain a Fourth Amendment excessive force claim," *Sullivan v. City of N.Y.*, No. 10 Civ. 0038 (NRB), 2011 WL 3806006, at *4 (S.D.N.Y. Aug. 29, 2011), the case law also reflects that excessive handcuffing "may constitute use of excessive force," *Dotson*, 2012 WL 996997, at *5 (citing *Kerman v. City of N.Y.*, 261 F.3d 229, 239–40 (2d Cir. 2001)); *see also Robison*, 821 F.2d at 924 (noting that a plaintiff can recover for damages for excessive handcuffing even if the

injuries are not severe).  Ultimately, "[l]ike all excessive force claims, the pivotal question is

whether the officer[s'] behavior was objectively unreasonable in light of the circumstances."

*Dotson*, 2012 WL 996997, at *5.  Treating the facts alleged in the Amended Complaint as true,

the Court concludes that Hershey has plausibly pled that the officers' behavior was unreasonable.

The motion to dismiss these claims on the pleadings is, therefore, denied.

### 5.  Negligence

"Under New York law, the elements of a negligence claim are: '(1) that the defendant

owed [plaintiff] a duty of care; (2) that the defendant breached that duty; and (3) that the

defendant's breach was the proximate cause of the plaintiff's injuries.'" *Dotson*, 2012 WL

996997, at *9 (alteration in original) (quoting *Stanback v. JPMorgan Chase Bank, N.A.*, No. 10-

CV-4155 (RRM)(RLM), 2012 WL 847426, at *5 (E.D.N.Y. Mar. 13, 2012)).  However, "New

York does not, as a matter of public policy, recognize a claim for negligence arising out of an

arrest or prosecution." *Id.* at *10 (quoting *Paul v. Bank of Am. Corp.*, No. 09-CV-1932

(ENV)(JMA), 2011 WL 684083, at *3 (E.D.N.Y. Feb. 16, 2011)).  Accordingly, Hershey's

attempt to "'circumvent the well-established requirements of the false arrest . . . cause of action

by inventing new theories of negligence'" is unavailing.  *Id.* (quoting *Jenkins v. City of N.Y.*, No.

91 Civ. 3639 (RLC), 1992 WL 147647, at *8 (S.D.N.Y. June 15, 1992)); *see also Pandolfo v.*

*U.A. Cable Sys. of Watertown*, 171 A.D.2d 1013, 1014 (4th Dep't 1991) ("As a matter of public

policy, there is no cause of action in the State of New York for negligent prosecution or

investigation.").  The Court therefore dismisses his negligence claim.

### 6.  Constitutional Tort

Hershey also brings a claim for constitutional tort under the New York State Constitution.

This claim is based on the conclusory assertion that defendants, "acting under color of law,

violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11 and 12 of the New York State

Constitution."  Am. Compl. § 155.  Hershey does not allege specific facts to support these

assertions, and, as best as the Court can tell, the claims duplicate his other claims.  "District

courts in this circuit have consistently held that there is no private right of action under the New

York State Constitution where, as here, remedies are available under § 1983."  *Campbell v. City

of N.Y.*, No. 09-CV-3306 (FB)(JO), 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011) (citations

omitted); *see also Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628–29 (S.D.N.Y. 2009) (New York

State constitutional tort claims as to search and seizure are "unavailable where an alternative

remedy will adequately protect the interests at stake"), *abrogated on other grounds by Ginsberg

v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d Cir. 1999).  Hershey therefore fails to

state a claim for constitutional tort, and that claim is dismissed.

### 7.  Supervisory Liability

Hershey alleges that supervisors within the CUNY educational system and the public

safety office are liable for his damages and injuries under § 1983.  To support a supervisory

liability claim under § 1983 in the Second Circuit, a plaintiff must allege "personal involvement"

of a defendant in any alleged constitutional deprivations.  *Scott v. Fisher*, 616 F.3d 100, 110 (2d

Cir. 2010) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).  Personal

involvement of a supervisor may be shown "by evidence that: . . . the defendant, after being

informed of the violation through a report or appeal, failed to remedy the wrong [or] . . . the

defendant was grossly negligent in supervising subordinates who committed the wrongful acts."

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

To the considerable extent that the allegations in Hershey's Amended Complaint merely

"parrot these evidentiary routes for supervisory liability" without alleging sufficient personal

involvement of the individual defendant in question, they cannot meet the plausibility pleading

standard, and must be dismissed. *Dotson*, 2012 WL 996997, at *6 (citing *Harris v. Mills*, 572

F.3d 66, 72 (2d Cir. 2009)).  Notably, Hershey does allege that during his arrest, when he asked

public safety officer Irizariz "if he understood that he was violating" Hershey's rights, Irizariz

"replied that he was just complying with his supervisors' directives."  Am. Compl. ¶¶ 73–74.

Thus, drawing all inferences in Hershey's favor, the Court allows Hershey's claim of supervisory

liability under § 1983 against defendant Laperuta, Lehman College's director of public safety, to

proceed.  However, because concrete factual allegations as to the personal involvement of

defendants Goldstein, Fernandez, Zucchetto, Tulier, and unknown supervisory officers Richard

Roes are lacking with respect to the surviving claims, these claims against them are dismissed.

### D.  Qualified Immunity

Finally, defendants argue that, even where Hershey has adequately pled a claim,

dismissal is still warranted on grounds of qualified immunity.  Qualified immunity "shields

government officials from civil damages liability unless the official violated a statutory or

constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v.

Howards*, 132 S. Ct. 2088, 2093 (2012).

However, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion

instead of a motion for summary judgment must accept the more stringent standard applicable to

this procedural route."  *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).  Therefore,

although possible, "*[u]sually*, the defense of qualified immunity cannot support the grant of a

[Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted."  *Id.*

(alteration and emphasis in original) (quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir.

1983)).  Such is true here.  At this early stage, it is premature to resolve defendants' qualified

immunity defense, because Hershey's allegations, on which defendants here must rely, do not sufficiently "support[] the defense . . on the face of the complaint." *Id.* at 435.

## CONCLUSION

For the reasons stated above, the motion to dismiss is granted in part and denied in part. All of Hershey's claims arising out of his on-campus leafleting activity are dismissed. As to the off-campus leafleting activity, Hershey's § 1983 claims for violations of his First and Fourth Amendment rights, as well as his claims for false arrest and false imprisonment, and excessive force and assault and battery, survive as against defendants Cruz, Freytes, Gallan, Irizariz, and Laperuta, but are dismissed as to defendants Goldstein, Fernandez, Tulier, Zucchetto, John Does, and Richard Roes. Hershey's remaining claims for abuse of process and malicious prosecution, negligence, and constitutional tort are dismissed in their entirety.

The Clerk of Court is instructed to terminate the motion pending at docket entry number 16. A pretrial conference in this matter is scheduled for April 30, 2013, at 4:00 p.m.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: April 9, 2013
    New York, New York